MERCANTILE TRUST CO. *v.* MISSOURI, K. & T. RY. CO. *et al.*

*(Circuit Court, D. Kansas.* December 23, 1889.)

1. RAILROAD COMPANIES—MORTGAGE FORECLOSURE—RECEIVERS—EXTENSION OF POWERS.
    Where a railroad is in the hands of receivers pending suits of foreclosure and settlement of the priority of liens, it is proper, on the application of a lienholder claiming priority, to extend the receivership, as to such claim, over the portion of the road on which the priority is claimed.

2. SAME—MOTION TO CONSOLIDATE SUITS.
    A motion to consolidate three foreclosure suits, where all are not ripe for decree, and where nothing can be gained for the purpose of a hearing, will be denied.

3. SAME—LEAVE TO FILE CROSS-BILL.
    Leave to file a cross-bill in a suit of foreclosure, where it appears that the purpose is to secure, between an alleged debtor and the mortgagor, an accounting not necessary to the determination of the suit, will be denied.

4. SAME—ALLOWANCE TO MORTGAGEE FOR EXPENSES.
    An order may be made on the receivers for the payment of expenses incurred by a mortgagee in a suit of foreclosure, where the mortgage makes provision for such expenses.

5. SAME—ATTORNEY'S FEES OF MORTGAGOR.
    The mortgaged property being insufficient to pay the mortgages, an order cannot be made for allowance of counsel fees of the mortgagor, to be paid out of money in the hands of the receivers.

6. SAME—LEASE OF ANOTHER ROAD—NOTICE TO MORTGAGEES.
    The court has power, on consulting the receivers, and without notice to the mortgagees, to order the lease of another road which is found necessary to the profitable management of the mortgaged property.

7. SAME—PARTIES.
    In a foreclosure suit against a corporation, the legal title being in the mortgagor, an application to bring in its grantor as a defendant will be denied.

In Equity. On bill for foreclosure. For former report, see 36 Fed. Rep. 221.

*Simon Sterne, Charles F. Beach, Jr.,* and *L. B. Wheat,* for the Missouri, Kansas & Texas Railway Company.

*Wheeler H. Peckham* and *Rossington, Smith & Dallas,* for the Union Trust Company.

*Alexander & Green,* (*William W. Green,* of counsel,) for the Mercantile Trust Company.

*Dillon & Swayne,* (*A. L. Williams,* of counsel,) for George J. Gould and Russell Sage, trustees.

*Alexander G. Cochran,* (*Winslow S. Pierce,* of counsel,) for the Missouri Pacific Railway Company.

BREWER, C. J. In these foreclosure cases, during the last six months, have accumulated several motions and applications, which, by consent

of counsel, have been passed for hearing from time to time, until week before last, when they were all separately argued and presented. I shall notice them one by one, and briefly state my conclusions.

In the order appointing receivers, they were directed to keep their accounts so as to show the earnings and expenses of the separate divisions, and the auditor was thereafter orally instructed to keep the accounts on a mileage basis. The equity of such a basis, as between the northern and southern divisions, having been challenged, in May last I appointed a committee to report an equitable basis therefor. It did make a report, and exceptions thereto were filed by the two trust companies. At the hearing last week no one seemed inclined to call this matter up. Neither trust company pressed its exceptions. I notified counsel that I would make some order. I think the basis reported by the committee just and equitable; and as on May 22, 1889, in the order appointing the committee, I directed that the accounts from and after April 1, 1889, should, upon the final determination by this court of a true and equitable basis between such divisions, be kept and stated upon such basis, and as no reasons have been presented that the basis reported by the committee is not just and equitable, an order will be entered that the exceptions will be overruled, the report approved, and the accounts from April 1, 1889, kept and stated on that basis.

Another matter is the application of the Missouri, Kansas & Texas Railway Company to bring in as a defendant the Missouri, Kansas & Texas Extension Railway Company. This application will be denied. The present defendant holds the legal title; and in the foreclosure of a mortgage it is generally enough to have the mortgagee and the holder of the legal title parties, without bringing in a grantor of such title. All questions as to the amounts of the various liens, and the portions of the road upon which they rest, can be settled without the presence of the extension company; and therefore it were useless to delay for the sake of bringing it in.

Another matter is the application of the Union Trust Company to have the receivership extended in its behalf to 94 miles of road in Texas. The basis of this application is found in the amended bill and exhibits thereto attached. Upon the papers as thus presented, it would seem as though that trust company had a lien upon these miles; and therefore it is fitting that the receivership be extended as applied for, in order that, if the fact and priority of its lien be finally determined, and there be any surplus earnings derived from this portion of the road, they may be awarded to it. Of course, such an order carries no adjudication as to the merits of the claim; nor, considering the lateness of this application, will the receivers make any change in their accounts.

Another matter is this: There is a motion to consolidate the three cases pending in this court for foreclosures of different mortgages given by the railway company. Nothing can be gained by consolidation, for the purposes of hearing. Whether consolidation could be had for purposes of decree and sale is a matter not necessary now for determination. That the court has power to consolidate cases situated as these are, I have

no doubt; and, if all were now ripe for decree, my impression is that equity would require a consolidation. But the cases are not ripe for decree, and there is no certainty as to when either one will be. If one be delayed, while another is speeded, it may be that consolidation will never be proper; for the mortgagee who is prompt ought not to suffer for the delay of one who is a laggard. The motion to consolidate will therefore be denied, with leave to renew the same when either case is ripe for decree.

Another matter: Leave is asked by the Missouri, Kansas & Texas Railway Company to file a cross-bill against the Missouri Pacific Railway Company and the trust companies. This cross-bill seeks an accounting with the Missouri Pacific Railway Company, a decree terminating the lease with the Missouri Pacific Railway Company, and an adjustment between the trust companies of their liens. Such a cross-bill is not necessary for the protection of the rights of the Missouri, Kansas & Texas Railway Company; would tend to delay; and is therefore improper. All matters between the trust companies, as to the extent of their liens and the portions of road subject thereto, can be fully settled without a cross-bill. It would be strange if a mortgagor could delay his mortgagee while he proceeds to establish an accounting with an alleged debtor. If the Missouri Pacific Railway Company owes the Missouri, Kansas & Texas Railway Company anything, it should be sought by an original action. And, while there is some plausibility in the claim that there should be an affirmative decree against the Missouri Pacific Railway Company, canceling its lease, yet that is a matter of special interest to the mortgagees, and it is safe to trust the matter to them. Their mortgages were prior in time to the lease, and, of course, paramount; and a decree of foreclosure rendered in their favor against the Missouri Pacific Railway Company will bar it of any pretense of right founded thereon. Generally speaking, in reference to this and other matters, a court should not, in the foreclosure of a mortgage, unnecessarily incumber the record with parties or questions. So far as possible without injustice to any, the simple matter of the foreclosures should be attended to. Other matters and other rights should be relegated to other suits, so that the foreclosure can be had as directly and speedily as possible.

Another matter is this: Application is made by the Union Trust Company for an allowance to it for expenses already made, and services in the prosecution of this suit and the execution of its trust. The trust-deed provides for the payment of these expenses, as well as compensation for the execution of the trust. An order will therefore be entered directing the receivers, out of the moneys on hand, to pay over to the Union Trust Company $5,000 on account of expenses and services.

Another matter is this: Application is made by the Missouri, Kansas & Texas Railway Company for an allowance out of funds in the hands of the receivers for the payment of its counsel. That there is much litigation carried on by the railway company, and that the services of counsel are easily worth the sum that is asked for, I have no doubt; and it would give me great pleasure to sustain the application, if I could see

any legal justification therefor. By a mortgage the body of the property is pledged for the payment of the mortgage. When that mortgage is being foreclosed and a receiver is appointed, the income of that property becomes also appropriated to the satisfaction of the mortgage. Now, whatever may be done in the way of arrangement and reorganization, it is very clear that upon a sale this property would not bring the mortgage debt. Far from it. Hence, to appropriate moneys in the hands of the receivers to the payment of the mortgagor's debts—and his counsel fees are his debts—would be to take money that is legally pledged and appropriated to the satisfaction of the mortgage; and that, too, when it is known that all thus pledged and appropriated is insufficient to pay the mortgage debt. It is suggested that certain securities were transferred, by the voluntary act of the railway company, to the receivers; and that is urged as a reason why this appropriation should be made. Two answers are obvious: *First.* No funds have been realized from those securities, and it is not certain that any ever will be. To take funds out of the hands of the receivers, derived from the earnings of the road, would be a forced loan on account of those securities, with no certainty of repayment. *Secondly.* It is a disputed question whether those securities are not also subject to the mortgage lien. So, while it would give me great pleasure to make this allowance, and I have thought over the question for a long time, it having been suggested last spring, I cannot satisfy myself that there is any legal justification for making such appropriation out of the funds in the hands of the receivers, and the application must be denied.

A final matter that I shall consider is the motion of the trust companies to set aside the order for the leasing of the Kansas City & Pacific Railroad. The motion is based solely on the ground of a want of power, and the lack of notice to the trust companies; and it is earnestly insisted that a court, in the management of a trust property through receivers, has no power to risk that property in new enterprises, and that the mortgagees and owners of the property are entitled to be heard before any such use of their property is attempted. It is important that the exact situation should be understood, as well as exactly what was done. Prior to the appointment of the receivers, the railway company had been operated by the Missouri Pacific Railway Company, for many years, under a lease. Its lines did not touch Kansas City, St. Louis, or Chicago, the three great cities of the west, from which its business was to be expected. The St. Louis and Kansas City business reached its lines only over the tracks of the Missouri Pacific, the lessee road. A large amount of business came from Kansas City. It could continue its arrangements with the Missouri Pacific, or it could make arrangements with other roads for bringing that business to its lines. It was the duty of the receivers to seek to do that business in the best manner possible for the property they had charge of, and to increase that business as much as possible. The Missouri Pacific, the Kansas City & Southern, the Fort Scott, and the Kansas City & Pacific, all furnished means of bringing that business onto its lines. With the first three roads it could make traffic arrange-

ments; the latter it could lease. By arrangement with the latter it could also secure the running of independent trains of its own into Kansas City. After carefully considering the situation for some weeks, the receivers, in consultation with myself, believed that the best interests of the property would be promoted by the lease of the Kansas City & Pacific. Now, this was a new business in the sense that it was a new way of reaching the Kansas City business; but it was not new in the sense of being a distinct and independent matter, foreign to the work the road was then doing. It is new, but in a very different sense from the leasing of a manufacturing establishment in an eastern city, or the purchase of an hotel at some summer resort. It was new; but, in a similar sense, it was also new to lease a freight office in St. Louis or one in Kansas City. It was not a new, distinct, and independent enterprise, but simply a new way and means of doing that which was already being done; that is, attending to the carrying business between Kansas City and the south. Now, receivers have in more than one instance, under the direction of the court, built miles of road; and such action has been approved by the supreme court. I agree perfectly with counsel that matters of this kind are to be entered upon reluctantly, and only after careful examination and deliberation; and yet sometimes the interests of the property, indeed almost the preservation of its business, may require something more than the mere operation of the trust property. And, if the courts may build a railroad, I think they have power to lease one already built, not for the sake of entering into new and independent enterprises, but simply for the sake of more successfully carrying on the work in hand. Counsel have not pressed, as a reason for setting aside the order, the injurious effects upon the property; for experience has already demonstrated that it was most beneficial. So far as the want of notice is concerned, the rulings of the supreme court are to the effect that, given the power, the lack of notice does not vitiate the action. Of course, as a general thing, notice should be given; and the question of giving notice was duly considered. It would not have been fair to give notice to one party, and not to all; and giving notice to all, it was seen, would give knowledge of what was proposed to competing roads, who might easily, by better offers or otherwise, have prevented the consummation. Hence, not from a desire to do anything underhandedly, or to take advantage of the ignorance of the parties in interest, but from motives of business prudence, notice was withheld. My conclusion, therefore, is that the power existed; that a lack of notice did not vitiate the action. The motion to set aside the order will be overruled.

This closes all the matters that were presented; and I might, perhaps, properly stop here. And yet, as this is about the last of my official connection with the management of this property, I may be pardoned if I indulge in a brief retrospect of what has been done during this receivership. As heretofore stated, when the receivers were appointed the road had been operated for years by the Missouri Pacific Railway Company under a lease, and practically as one of the divisions of that system. It had no general offices or officers, no independent relations with other roads

or railway systems. The receivers had to secure a full corps of general officers, and initiate the management of this road as an independent property; and in so doing my instructions to them were—and I believe they have faithfully carried them out—to operate the road as an independent property, in no antagonism, spirit of revenge, or desire for injury, but with the simple desire to further and preserve the best interests of the property. That their administration has been successful, these figures will show: The earnings for the 12 months prior to their appointment were $6,403,562.81; during the first 12 months of their appointment, now just finished, $7,319,317.75. Comparing August, September, and October, 1888, with the same months of 1889, we find the former show, respectively, $572,569.41, $597,725.70, and $601,253.48; and the latter, $696,395.71, $712,587.60, and $883,156.83. With one exception, every month in this year has shown an increase in earnings over the prior month. Not only have the earnings increased, but the prices of the bonds, also. When the receivers were appointed the 5's, 6's, and 7's sold at 54, 60, and 92, respectively; now, at 64, 74, and 109. Again, at the time of their appointment the road-bed was in many places in poor condition, and the supplies on hand limited; indeed, so much so that in the summer before a committee appointed by the company to carefully examine the property had reported the necessity of an expenditure of $3,000,000, to put it in good condition. The receivers have put upon the road 16,704 tons of 63-pound steel rail, at a cost of $464,948.12; 828,810 new cross-ties, at a cost of $398,194.13; have ballasted with rock and gravel 204 miles of road, at a cost of $94,638.44; have completed 17½ miles of side track, at a cost of $63,917.09; have purchased 7 passenger engines, at a cost of $62,075; 25 freight engines, at a cost of $199,987.35; 500 coal-cars, at a cost of $190,250; have built 11 station-houses, at a cost of $54,657; have built and rebuilt 45 bridges, at a cost of $36,510; have built and rebuilt 474 trestles, at a cost of $161,682; have completed the road from Dallas to Waxahachie, upon which $144,000 had been spent before their appointment, at a cost of $187,736.09; have paid all interest on the Booneville bridge bonds, the bonds on the Tebo Neosho and Hannibal Moberly divisions. They have not issued a dollar in receivers' certificates, and have half a million dollars on hand. The road is no longer a mere subdivision of a system, but an independent road, with recognized prospects in the future. Any one looking on the map can see at a glance that, if running arrangements for its trains out from Chicago and St. Louis similar to those it now has out of Kansas City can be made, it will be the most valuable north and south railway property west of the Mississippi. I feel sure that the owners, when the facts are known, will feel under a debt of gratitude to the receivers for the ability with which they have managed this property.

One thing more: In the early fall the receivers began to consult with me as to what was necessary for the betterment of the road during the coming year. I directed them to make all their estimates and applications, and present them at a time when the counsel for the various parties

in interest should be present at Topeka. This they did, and in considering those applications I have made orders looking for many improvements for the coming 12 months. In some of the orders I have inserted special limitations, and I have stated orally to the receivers, and now repeat in writing, that the authority given to make purchases or improvements must in no case be exercised to such a degree as to subject the property to the risk of receivers' certificates; that they must proceed with caution, and only buy as they have money with which to pay, or as they see will certainly be in their hands by the time payment is due. This is all that I think that I need say. I turn the administration of the property over to my successor in office, feeling sure that it is in good condition, and believing that he will have little work, beyond crowding the parties in interest into a speedy foreclosure and sale.