CLARK, District Judge.
This particular litigation had its inception in a petition filed by the state of Tennessee in the consolidated causes of the Central Trust Company of Hew York against the Harriman Coal & Iron Railroad Company, and J. H. Whitemore et al. against the Harriman Coal & Iron Railroad Company. Prior to August, 1893, the East Tennessee Land Company, a real-estate association, had been organized as a corporation under the general incorporation law of the state of Tennessee, with power and for the purpose of “locating, establishing, and building of towns and cities, the purchase, improvement, development, and sale of property, and the establishment and encouragement of industries.” It was a chief aim and ambition with the original promoters and shareholders in this great company to establish in Roane county, Tenn., a prohibition city, and thereby furnish to the country an object lesson in prohibition and the good which would result therefrom. This was an undertaking which at once secured the interest and co-operation of a class of people of great intelligence and culture. Accordingly, large bodies of mineral lands were purchased and conveyed to the great company, and the city of Harriman founded at the junction of the Harriman 'Coal & Iron Railroad with the C. S. Railroad, a line extending from Cincinnati to Chattanooga, Tenn., and then under lease for a term of years to the O., H. O. & T. P. Railroad Co. The development of these large bodies of mineral lands, as well as the establishment of the city of Harriman, required the use and exercise of corporate franchises and powers beyond such as could, under the statutes of the state of Tennessee, be vested in one corporation. Accordingly, subsidiary corporations were organized, with powers suitable to carry forward to successful results the large scheme of the principal corporation. Most important among such subsidiary corporations was the Harriman Coal & Iron Railroad Company, organized for the purpose of building a railroad to connect the coal fields of the Big Brushy Mountain with the East Tennessee, Virginia & Georgia, and the Cincinnati Southern Railroads and with the city of Harriman, in order thereby to furnish means of transportation for “coal, coke, stone, timber, tan bark, and other mineral and substances found in abundance in the said Big Brushy Mountain district.” This contemplated railroad was to extend from its junction with the Cincinnati Southern, at the city of Harriman, to the junction of Stogdills 'Creek with Crooked Fork, in Morgan county, Tenn., near which last point the state of Tennessee finally purchased about 9,000 acres of mineral lands, for the purpose of erecting thereon its mining penitentiary, in order that the state convicts might be employed in developing and operating coal mines; the state of Tennessee having abandoned the previously existing lease system of dealing with its convicts, and determined, by proper legislation, to work the penitentiary convicts through a penitentiary commission in opening up and operating some of the undeveloped coal fields in the state. The penitentiary commission, under legislative authority, *832 and in execution of the new scheme, advertised for mineral lands, being authorized to expend a sum not exceeding $80,000 for the purchase of lands of this character on which to establish its mining penitentiary. Among other properties offered to the commission, the East Tennessee Land Company proposed to sell the Big Brushy Mountain coal fields, before referred to, and the negotiations which followed resulted in the execution of a memorandum contract between the state of Tennessee, -acting through its committee, and the East Tennessee Land Company. This contract is dated August 1, 1893. The quantity of land to be conveyed was 9,000 acres, at the price of $80,000. The contract provided expressly that it was not to go into effect or be binding upon the state of Tennessee until certain conditions were performed. The conditions which more immediately affect the matter now under consideration are as follows:
First. “Nor is the same to go into effect unless, within twenty (20) days from this date, a bond is executed to the state in the penal sum of one hundred and sixty thousand dollars, conditioned that the Harriman Coal & Iron Railroad shall be completed from its present terminus to a point to be selected, at or near the junction of Stogdills creek with the Crooked Fork, by the committee or any engineer selected by it, as the place where the sidings for coal mines to be opened by the state are to be located; said road to be completed to that point within six (6) months from this date, and satisfactory arrangements made as to equipping said road for operation.”
Second. “This contract is not to go into effect until the committee on behalf of the state have arranged and agreed with the companies owning and controlling the Cincinnati Southern Railroad and the Harriman Coal & Iron Railroad, as to rates for transporting coal, coke, and the other products of said mines to be located on said lands, as well as the charges for carriage of persons and property to and from said mines over their said lines of railway.”
In tbis condition of affairs, and before tbe sale from tbe East Tennessee Land Company to tbe state of Tennessee was consummated, tbe East Tennessee Land Company, tbe Cincinnati Southern Bailroad, under lease as before stated, and tbe Harriman Coal & Iron Bailroad Company, were placed in tbe bands of receivers under foreclosure bills filed in tbe United States courts against these companies respectively. In June, 1894, a contractwas executed between tbe Cincinnati, Hew Orleans & Texas Pacific Bailway Company, through Mr. Felton, its president and receiver, and tbe Harriman Coal & Iron Bailroad Company, being a traffic contract in regard to shipments to come over tbe Harriman Coal & Iron Bailroad. Among other provisions in tbe contract were the following:
“Now, therefore, it is agreed, between the parties hereto that, in ease the said state of Tennessee shall purchase the said lands hereinbefore referred to, then and in such event the contract herein contained shall be binding upon both parties hereto upon the terms and conditions hereinafter mentioned, and which are as follows: (1) This agreement covers and applies to all freight of passenger traffic having its point of origin or point of ultimate destination on the line of the Harriman Coal & Iron Railroad Company, northwardly from and beyond De Armond Junction, Tennessee, which passes through Harriman, Tennessee, having also its destination or origin beyond Harriman.” “(3) It is agreed by and between the parties hereto that the party of the first part shall have the sole and exclusive right to fix all rates upon the traffic hereby provided for, provided, however, that such party shall assume and pay all expense incident to preparing and publishing such rates.” “This contract shall remain in force until the expiration or other determination of the present lease from the city of Cincinnati to the Cincinnati, New Orleans & Texas Pacific Railway Com *833 pnny, of the railway operated by said company. The state of Tennessee shall he entitled to any benefit or advantage that may accrue to it from the operation of this contract, but shall not be liable thereon.”
And in August, 1894, a contract was executed between tbe Cincinnati, New Orleans & Texas Pacific Railway Company and the state of Tennessee, by which freight rates on the product of the state mines to be opened and operated were fixed. Among other provisions materially affecting the matter now under consideration, the following may be set out:
“It being recognized that the primary and principal object and purpose of this contract is to provide that the party of the second part shall at no time be under any unjust disadvantage, as compared with any other mine located on the lines of the party of the first part, in regard to reaching competitive markets, and disposing of its coal in such markets, the party of the first part hereby contracts that, during the tenure of this contract, it will at all times, so far as it may have the right to do, or so far as it may be within the scope of its influence with connecting and other carriers and transportation lines, to provide and maintain such lawful tariffs and rates on coal, and other products of said mines, distances and other conditions considered, as will enable the party of the second part to meet all fair and legitimate competition in the sale of such products, at all points that can be reached by the lines of the party of the first part and. its connections, so far as the rates of transportation bear an influence on the.meeting of such comxxetilion; it being the purpose of this agreement that the party of the first x>art shall, in all legitimate ways, in the fixing and maintenance of rates for transportation, aid and assist the party of the second part in marketing the product of its mines.”
It will be observed that the previous contract between these two railroad companies expresslv conferred upon the Cincinnati, New Orleans & Texas Pacific Railway Company the power to fix a through freight rate for shipments coming over the line of the Harriman Coal & Iron Railroad Company, and it was pursuant to the authority given that company in said contract that it entered into this contract with the state of Tennessee. It will also be noticed that the reason why the state officials were anxious to secure a contract for freight rates which would continue during the lease of the Cincinnati Southern Railroad was to avoid being put at a disadvantage by unfavorable rates in reaching competitive markets, for otherwise the state would have been left completely at the mercy of the Harriman Coal & Iron Railroad Company as to local rates over its line, there being no competitive line or other means of transportation for the products of the Big Brushy Mountain coal fields.
November 21, 1893, Whitemore’s bill was filed against the Harriman Coal & Iron Railroad Company, being a general creditor, and insolvent bill to wind up the affairs of the company. Thereafter, May 7, 1894, the Central Trust Company of New York, trustee, in a mortgage executed by that company to secure certain outstanding bonds, filed its foreclosure bill in the Northern division of the Eastern district of Tennessee; and the two causes, being in the same court, were subsequently consolidated, and such steps were had that a foreclosure decree was pronounced, the property put up at a special master’s sale, and bid off by E. A. Quintard, as trustee. This bid was subsequently assigned by Quintard to William Neisel, and by Neisel to Isaac K. Punk and others, they being members of a reorganiza *834 tion committee, which will be noticed further on. At the time the Harriman Coal & Iron Railroad Company went into the hands of a receiver, its line of railroad was in process of construction, but not yet completed. It became evident that, unless it could be in some way fully constructed, the amount that had already been invested would become a total loss, and without means of transportation it was certain the state could not go forward with its mining enterprise. It was also manifest that the principal transportation business which would be furnished to this line of railway, and by which it could be made successful, would be the product of the state mines. In this situation of affairs, and while the suits against the company were pending, the receivers appointed under those suits made application to the court by petition filed June 12, 1894, for authority to issue receivers’ certificates necessary to complete the line of railway, and also for authority, as receivers, to execute the traffic contract which had previously been entered into between the company of which they were receivers and the Cincinnati, New Orleans & Texas Pacific Railway Company, before referred to. In that petition tin receivers state:
“Your orators further show that the said contract between the state of Tennessee and the East Tennessee Hand Company has been so far perfected that the same is in full force and effect, to he carried out, however, only upon condition that the said railroad shall he completed to the said coal fields from its present terminus. Your orators further show that it is the purpose of the state of Tennessee to erect its penitentiary mines upon said tract of land near the junction of Stogdills and Crooked Fork creeks, in said Morgan county, and to mine therefrom coal, quarry stone, and make coke, and sell said coal, stone, and coke upon the general market, and that all the product of said mines and quarries will be transported over the line of the Harriman Coal & Iron Railroad to its junction either with the East Tennessee, Virginia, & Georgia Railroad, or the Cincinnati Southern at Harriman, Tennessee, if destined to points beyond Harriman, and that said traffic will be large, and will afford good earnings upon all the investments that have been made or will be required to be made to complete said road, and to put the same in operation, for the purpose of carrying the traffic to and from the said state mines so to he erected as aforesaid.”
A copy of the contract between the two railroad companies executed in June, 1894, was made an exhibit to this petition, containing, as we have seen, a provision that the state of Tennessee should be entitled to any “benefit or advantage that may accrue to it from the operation of this contract.” The question whether it was advisable and desirable, in the interest of the Harriman Coal & Iron Railroad Company and others, that the authority asked by the petition should be granted, was referred to a special master in chancery, and, upon his favorable report, full authority was granted to the receivers to issue the construction certificates desired, and to execute the traffic agreement. It is to be borne in mind that this contract had been previously executed between the two corporations, and nothing further was necessary or desirable to make it binding and effective on those companies. The receivers, pursuant to the authority thus conferred, duly executed the contract as receivers; and the state of Tennessee proceeded with the prosecution' of its work, and has expended large sums of money in improvements *835 and developments on the lands purchased, and is now engaged in coal mining as originally contemplated. In the decree directing a sale of the railroad, no provision or reservation was made in regard to the rights of the state of Tennessee under the two contracts before referred to. After the property was bid off by Quintard at the special master’s sale, but before confirmation of the sale or any action by the court, the state of Tennessee intervened by this petition in the consolidated causes, and sought to have the rights of the state under said contract defined and set up by proper decree, and to have such rights declared obligatory upon the purchasers of the railroad. The purchaser, Quintard, waived process, entered his appearance, and answered, denying the state’s right to any relief, and denying in a somewhat general and evasive way the charges of the petition. The opinion of the circuit judge shows that he entertained the view that the state intervened too late, because its petition was not filed before the decree directing the sale of the property, and that upon this ground, without going into the merits of the question, the petition was dismissed, with costs. From that decree the state has prosecuted this appeal, and assigned errors. No other method has been suggested by which the state could have asserted or secured an adjudication of its rights. It is certain that if the state had rested until a confirmation of the sale, and payment of the purchase price, and certainly after the property might have passed into the hands of innocent holders, great difficulty would have been found in maintaining its rights, if any, under these contracts. We are clear that the petition was properly and seasonably filed. The cases, both federal and state, fully establish the rule that Quintard’s bid for the property at the special master’s sale was only an offer to take the property at that price, and that acceptance or rejection of f at offer was within the sound legal discretion of the court, to be exercised with due regard to the special circumstances of the case. ’The acceptance of his offer could only have been manifested by an order confirming the sale, and, until that was done, he acquired no title, and there was in his position at the time this petition was filed no element of an innocent purchaser. Camden v. Mayhew, 129 U. S. 73, 9 Sup. Ct. 246; Blossom v. Railroad Co., 3 Wall. 196; Mayhew v. Land Co., 24 Fed. 205; Reese v. Copeland, 6 Lea, 190.
It is also settled that the purchaser, by his bid, becomes a quasi party to the suit, and is affected with notice of every step subsequently taken in the case relating to the purchase and the title acquired thereby. Davis v. Trust Co., 152 U. S. 594, 14 Sup. Ct. 693; Kneeland v. Trust Co., 136 U. S. 89, 10 Sup. Ct. 950; Stuart v. Gay, 127 U. S. 518, 8 Sup. Ct. 1279; Blossom v. Railroad Co., 1 Wall. 655; Muse v. Donelson, 2 Humph. 169; Allen v. East, 4 Baxt. 308; Reese v. Copeland, 6 Lea, 193. And this rule holds good even as to the sureties of the purchaser, executing with him notes for deferred payments on the purchase price. Deaderick v. Smith, 6 Humph. 139; Munson v. Payne, 9 Heisk. 672. Such part of the purchase price as may have been paid in cash at the time of sale was still in the registry of the court, and, like the purchaser’s bid, completely under the control of the court. In this state of affairs, the state’s petition, *836 as we have seen, was filed, and the purchaser, Quintard, given full and distinct notice of the rights asserted by the state. The sale not yet having been confirmed, it was competent for him, upon said petition being filed, to have sought to be relieved from his purchase, if unwilling to take the property subject to the state’s rights, if any. He did nothing of this kind. On the contrary, pending this litigation with the state, the sale was confirmed by order of the court, the decree of confirmation reciting that such action was had after due notice to all parties to the cause of the application to' confirm. The decree contained the following express reservation:
“But this decree of confirmation is made subject to whatever rights the state of Tennessee or the penitentiary commissioners may have upon the hearing- of their petition herein already filed.”
The purchaser, without invoking any action of the court whatever in view of the state’s petition, has gone forward, and completed the sale, by the payment of the purchase price; and the purchase price, except a comparatively small balance, has been disbursed in the payment of the construction certificates and other claims having-priority. In view of this situation, we have no hesitation in holding that the purchaser, with full knowledge, has elected to take the property bid off, subject to the obligations of these traffic agreements, provided there exists any obligation in favor of the state. And we are thus brought to the question of whether or not these contracts confer, and were intended to confer, upon the state, a right to their enforcement against this railroad, and whether the property passed to the purchaser by the sale subject to such right; and upon this point we entertain no doubt. It will conduce to a better understanding of the case and the question if we keep in view the main facts hereinbefore recited, which led up to making these contracts, and the relation of all parties to the same, and their interest therein. It would be entirely without the support of reason to suppose that the state’s officials would have manifested the precaution which they did to secure a contract for reasonable freight rates extending, over a period of some years, binding only on companies which had become insolvent, and were being wound up, or that these officials would have been content with the execution of such contract by the receivers of the court, with the understanding that it might at any time, however short, be ended with the termination of the receivership. The proposition that the parties interested in the state prosecuting its plan to a successful result understood that the obligations of the contract entered into by the receivers under authority of the court should last no longer than the receivership is equally unwarranted. The only just interpretation which can be placed upon the procedure which was had is that it was intended to subject this railroad, in the hands of a receiver, to the obligations of the traffic agreement in which the state was interested. Nothing short of this would have been an adequate inducement to the state to carry into effect its mining plan, and to make the large expenditures which would be necessary for that purpose. And the large freight traffic that would be thereby supplied to this line of railway, perhaps far exceeding all other sources of business combined, was fully sufficient *837 to justify those interested in the railroad property in desiring the state to have the full benefit of the long time contract which it demanded. We have not the slightest doubt that it was so understood on all hands. That this view is a just one is made manifest when we consider another aspect of this case. It is disclosed by this record that the East Tennessee Land Company, the vendor of the state, owned a large majority of the stock in the railroad company, and controlled and directed it. It further appears from the record that there has been put on foot a plan of reorganization, by which it is intended to bid in at foreclosure sales the large properties of the East Tennessee Land Company, as well as the line of railway in question, and in that way save all or a nart of the original investment in the capital stock of these companies, by the shareholders and security holders. We have no doubt that the interests which were represented in the sale of the coal lands to the state, and in making the traffic agreement between the two railroads, and causing its execution by the receivers under authority of the court, are substantially the same interests now represented by this reorganization committee, in taking and holding title to the railroad. Among other parts of the record from which this annears, we may mention a circular announcement of this fact, made exhibit to the deposition of H. L. Corey. It is insisted by counsel for the defendants that this exhibit, with its contents, is incompetent; but no ruling upon the objection was had in the court below, and we cannot do otherwise than treat it as part of the record. Dr. I. K. Funk, a gentleman of high character and large influence, is chairman of this reorganization committee, and, as such, he officially issued and sent abroad the circular referred to. Among other parts of this announcement are the following:
“Important News.
“To Investors of the Bast Tennessee Land Company:
“The Railroad Purchased—Money Wholly Subscribed.
“A most important part of the work of reorganization has now been accomplished. The railroad has been purchased, the money fully subscribed, and all of the stock (amounting to $600,000) now belongs absolutely to the reorganization committee. This is settled in the ownership of this stock. The reorganization committee has assets of solid value amounting to some hundreds of Thousands of dollars. No candid person fully acquainted with the facts will question this statement.
“A Monopoly.
“The railroad has the absolute monopoly for railroad transportation for the enormous coal fields of the Brushy Mountain region. These deposits of coal are of extraordinary proportions and value. As the purchase of the railroad is now an accomplished fact, the money to pay for it being arranged for, we trust that we run no risk of being accused of ‘booming’ if we tell you of the great value of this railroad. Now, no harm can come to you even though we should overjudge the value of this unique railroad property.”
The document then goes on to state that a foreclosure sale of the land company (meaning thereby the East Tennessee Land Company) properties has been ordered, and warning the original investors of the East Tennessee Land Company of the importance of being ready to bid in that property also. The following statement is found:
*838 “If we are not prepared to buy tbe lands at the foreclosure sale, they will be sacrificed, and the investors in the old company will lose practically all of the million dollars that have been invested in these lands. A creditors’ syndicate is being talked of to buy in these lands for its own benefit, it being assumed that the reorganization committee will not be ready to purchase. If the syndicate buys or outsiders buy, all the money invested by the stock and security holders of the old company in lands will be practically lost. It will be a most shortsighted thing for the stockholders and security holders to permit this tremendous loss, for, by a united effort, it can be prevented in a large part, and possibly wholly.”
Attention is then directed to the rich and promising oil and gas discoveries which have been made upon this great body of land called the “Cumberland Plateau.” This circular, of course, was designed mainly to secure subscriptions to the proposed plan of reorganization. After setting out in detail many other substantial grounds on which the reorganization should be supported, the document concludes with a touching and eloquent appeal to that sentiment which was expected to establish and make successful the city of Harriman, in language as follows:
“In all the bitter disappointments, in the many troubles that have come upon us, we must not forget the original aim in this whole investment,—prohibition an object lesson to the country. It is chiefly because of this that your chairman has wrought as he has during the past eighteen months. Whatever our losses may be, prohibition still remains an issue of overwhelming importance. During one of his great battles, Napoleon, riding up to his chief of staff, asked how the battle was going. The officer replied, ‘Sire, this battle is lost, but .[pointing to the sun, still an hour high] there is time enough to win another.’ The ranks were formed, and a decisive victory was won. We have lost a battle at Harriman, but there is time enough yet to win, on that same battle field, a victory that will help the entire nation, and one that will go into history. With a heart within and God o’erhead, let us go> forward.”
Keeping in view the surrounding circumstances, we do not doubt that the state’s officials accepted the court’s action in authorizing the receivers to execute the contract previously made between the railroad companies, as assurance that the court, in its subsequent dealing with this property, would make good to the state its right to the freight rates secured to it by' such contracts. We think these officials were well warranted in the belief that the court would do this, and that they have acted all along upon that assumption. The receivers were the officers, “the mere arm” and agents, of the court in the administration of the trust then in hand, and any obligation assumed by them might justly be regarded as an obligation of the court. And, certainly, a court is under the highest possible obligation to require full performance of every obligation incurred with the court’s sanction. And parties and officers in a case before the court should be allowed to create no just expectations which the court does not fully satisfy. Felton v. Ackerman, 22 U. S. App. 154, 9 C. C. A. 457, and 61 Fed. 225; Wabash, St. L. & P. Ry. Co. v. Central Trust Co. of New York, 22 Fed. 269; High, Rec. §§ 1, 2, 175;. Railroad Co. v. Hoechner, 31 U. S. App. 644, 14 C. C. A. 469, and 67 Fed. 456.
In view of what has been said, and without pursuing the discussion further, we conclude that the two contracts now under consideration are to be construed together, both of them having been ex *839 ecuted in part, for the purpose of giving the state such a rate of freights as would induce it to proceed with the purchase of the property and development of the coal mine, with the benefits resulting therefrom to the railroad company, and that so construed, in the light of all the surrounding circumstances, these contracts conferred upon the state the right to the traffic rate stipulated for, and that to this extent the state may in its own name, in a court of equity, enforce the obligations of these contracts, the first as well as the second, although not a formal party to that contract. Undoubtedly, the primary object in the execution of these contracts by the railroad company, and subsequently the execution of the one by the receivers under authority of the court, was to confer upon the state a contract right in respect to freights such as would induce the state to act as it then contemplated doing; and the Harriman Coal & Iron Railroad will manifestly receive the benefits arising, and hereafter to arise, from the plan of operations thus entered upon by the state. So, too, the interests which were benefited by the sale of the coal fields to the state, being, as we have seen, the same interests now represented in the purchase of the road, we are clear that the railroad should be burdened with the obligation of the contracts so far as they operate in favor of the state. Upon the facts, no question is or could be seriously made upon the power of the court to sanction a contract of this character by the receivers. Nor is there room for doubt that the court’s discretionary power was in this case properly exercised. Kennedy v. Railroad Co., 5 Dill. 519, Fed. Cas. No. 7,707; Mercantile Trust Co. v. Missouri, K. & T. Ry. Co., 41 Fed. 8. It results from this view that the circuit court should have pronounced a decree declaring the state’s rights accordingly, and further adjudging that the purchase of Quintard was subject to the terms and obligations of these contracts, so far as they operated in favor of the state; and as the purchasers denied such right, and resisted the relief sought, the decree should have been with costs against thé defendants. Reversed, and case remanded, with directions to enter decree in favor of the state, and for such further proceedings as may be necessary not inconsistent with this opinion.