( ,  MAGANN et al. v. SEGAL et al.

(Circuit Court of Appeals, Sixth Circuit.   February 7, 1899.)

No. 683.

1. JUDICIAL SALES—RIGHTS OF PURCHASER—APPEAL.
    A purchaser at a master's sale, in equity, acquires such an interest in
    the property, by the acceptance of his bid, as to entitle him to appeal
    from an order refusing to confirm the sale.

2. SAME—GROUNDS·FOR SETTING ASIDE—INADEQUACY‚ OF PRICE.
    Mere inadequacy of price, unless so great as to shock the conscience,
    will not justify the setting aside of a sale and the reopening of biddings,
    but, to warrant such action, there must be additional circumstances,
    which render it inequitable to permit the sale to stand. .

3. SAME—ACCIDENT PREVENTING BIDS.
    A railroad was sold by a master for a price clearly inadequate, but  ·
    not so greatly so as to justify a refusal to confirm.   The sale was fairly
    conducted, and no fraud was practiced by the purchaser, but there was
    no opposing bid, because of the accidental failure of arrangements made
    by each of two intending bidders to make a deposit of $25,000 required
    to qualify them to bid.   Each of such intending bidders was interested
    in the property, and the amount realized therefor, aside from any interest
    as a purchaser, and each had made an arrangement for the deposit, such
    as he might reasonably rely on without being chargeable with negligence.
    Held, that their failure to bid was due to accident, such as; together with
    the inadequacy of the price realized, justified the court in refusing to
    confirm the sale and ordering a new one, on a tender of bids 25 and 30
    per cent. in advance of the selling price, and on application of nearly all
    the creditors interested. .

Appeal from the Circuit Court of the United States for the District
of Kentucky.

This is an appeal from a decree refusing to confirm the sale of a certain
railroad, made by a commissioner acting under the order and direction of the
circuit court.   The same decree ordered a resale, beginning at a price tendered
under an advanced bid made after the original sale had been reported.   The
appeal is by the original bidder, to whom the sale was made by the commis-
sioner.   The railroad property in question consisted of 63 miles of completed
railroad, extending from Versailles, in Kentucky, to Irvine, in the same state,
and some 36 miles of right of way, upon which much work had been done.
This railroad was incorporated under the name of the Richmond, Nicholas-
ville, Irvine & Beattyville Railroad Company.   Against that company a bill
was filed in the circuit court of the United States for the district of Kentucky,
by the Central Trust Company of New York, for the purpose of foreclosing
a mortgage made to secure an issue of bonds aggregating something like
$2,000,000.   Numerous creditors intervened, asserting mechanics', vendors',
and contractors' liens, and claiming preference over the mortgage.   A re-
ceiver was appointed, who thereafter operated the railroad under directions
of the court, who, by leave of the court, issued certificates of indebtedness
amounting to some $125,000, yet outstanding and unpaid.   Under this bill,
and the interventions mentioned, the court settled the amount of the mort-
gage and other debts, and determined that liens existed in favor of contract-
ors, material men, vendors, and holders of receiver's certificates aggregating
about $500,000, which were entitled to preference over the mortgage in the
sale of the property, and a sale was ordered accordingly.   From this decree
an appeal was taken to this court, where the decree of the circuit court was
modified in some particulars, but affirmed for the greater part, and the case
remanded, with directions to modify the decree and proceed with its execu-
tion.   The case is reported in full in 31 U. S. App. 704, 15 C. C. A. 289, and
68 Fed. 105.   An upset price of $550,000 was fixed, and the special commis-
sioner directed to accept no bid below that sum.   The property was accord-

ingly offered, but no bids were received. The court thereupon reduced the upset price to $250,000, and it was again exposed to sale, without any bids being received. In July, 1897, the court again reduced the upset price by fixing it at $160,000, which was about sufficient to meet the expenses of the litigation and discharge the receiver's debt, which was a first liability. Under the sale had under this decree, the property was bid off by a committee, representing the contractors' lien claims, for the price of $301,000, and the sale reported to D. A. Shanahan and others, representing nearly all of the lien claimants of the class mentioned. Some disagreement among this class resulted in an assignment of this bid to one Adolph Segal, who, by agreement of parties, not necessary to explain, was substituted as purchaser at the price of $255,000, and Shanahan and associates released. Segal paid $25,000 in cash, and executed two bonds, with security for the remainder of the purchase price, and a lien, with right to retake and resell the property in case of default in reserved payments, was retained. Segal assigned his purchase to the Louisville & Southeastern Railroad Company, a corporation organized by him to take and operate the property. Segal made default, and the security upon his bonds failed, and made an assignment. Thereupon, on July 2, 1898, a decree was entered against him and his security, and the said Louisville & Southeastern Railroad Company, ordering a resale of the property. This resale was ordered to be made at Versailles, a small town about 70 miles from Louisville, Ky. The upset price was again fixed at $166,000. By the provisions of this decree, no one was qualified to bid without first depositing with the commissioner the sum of $25,000 in money or a certified check for that amount satisfactory to him. Under that decree, the property was again offered for sale on October 6, 1898. The only bid made was $160,000 by the appellants, George P. Magann and associates. On October 28, 1898, the commissioner reported this sale to the court, and on same day the purchaser moved for confirmation. This was resisted by D. Shanahan and other large creditors and holders of liens subordinate to the receiver's certificates, and by Adolph Segal, the then owner of the property, all of whom filed petitions praying the court to refuse confirmation and reopen the biddings. These petitions were accompanied by affidavits tending to support the application for a reopening of the biddings. Segal supported his petition with an offer to make an advance bid of $200,000 if the biddings should be reopened, and presented security therefor. Shanahan presented with his petition an offer to open the biddings at $210,000, made by John Stites, trustee, which was secured by the tender of $100,000 in money.

The facts which seem to be established by the petition, exhibits, and affidavits as ground for reopening the biddings are that two intending bidders, who were present at the sale in person, or represented, were prevented from bidding by an accidental inability to qualify themselves as bidders by depositing with the special commissioner the amount required by the decree of sale. One of them was the appellee Adolph Segal, the owner of the property under his purchase at the former sale, who had made default in payment of the purchase price. Segal resided in the East. He was diligently endeavoring to protect himself against loss by putting himself in position by which he could bid the property up to a price which would secure himself against a deficiency. He arranged with a correspondent in Philadelphia to deposit in a Philadelphia bank $25,000 to the credit of a bank in Louisville, and with the Louisville bank to issue its certified check to his counsel in Louisville, Mr. D. W. Fairleigh, and that the latter should attend the sale and bid the property up to $240,000. His arrangement was that his Philadelphia correspondent should on day of sale, by 10 a. m., Philadelphia time (9 a. m., Louisville time), make the necessary deposit in the Philadelphia bank, and that the latter should then advise its Louisville correspondent by telegram to issue its check to Fairleigh. Fairleigh was advised of this plan on the afternoon of the 5th of October, the day preceding the sale. As the sale was to occur at Versailles, and not at Louisville, he arranged with the Louisville bank to issue, on the 5th, its certified check, payable to his order, and place it in the hands of Judge Alexander P. Humphrey, who was to attend the sale at Versailles, and hold the check until advised that Segal's deposit had been made in the Philadelphia bank as arranged. Judge Humphrey, with this

check, attended the sale. Upon communicating with the bank over the telephone, he was advised that the Louisville bank had not yet received the expected notice from its Philadelphia correspondent. The sale proceeded. Farliegh, though present with authority to bid for his client, Segal, could not do so, because the latter had not made the necessary deposit. Within an hour or two after the property had been knocked down to appellants, who were the only qualified bidders present, Judge Humphrey was notified by the Louisville bank to deliver its check to Fairleigh. This was too late. The sale was over. The fault lay with one of Segal's correspondents, who failed to make the deposit he had agreed to do, and failed to notify Segal's agent in time for the latter to make other arrrangements promptly enough to meet the exigencies of the case.

As to the second intending bidder: Shanahan and one Walker, who together owned or controlled nearly one-half of the preferential debts, had arranged to protect their claims by bidding upon the property up to $200,000. Walker agreed to furnish the necessary $25,000 to qualify them as bidders, and Shanahan was to furnish the security for deferred payments. This arrangement held down to the day before the sale, on which day Walker came to Louisville from Pittsburg with the necessary certified check to carry out the plan. After reaching Louisville, his nerve seems to have failed him, and he expressed a wish to be relieved from his arrangement with Shanahan. The latter had relied upon Walker to furnish the money to make the deposit, and saw no way, in the short time remaining, to obtain so large a sum. He agreed, however, to release Walker, provided the latter would lend him this certified check, and this Walker agreed to do, and indorsed the check, and placed it in the hands of Judge Humphrey, to be deposited with the commissioner. Thus prepared, Shanahan attended the sale, accompanied, however, by Walker. While the commissioner was reading the notice of sale, Walker again underwent a change of mind, and instructed Judge Humphrey not to give the check to Shanahan. To this the latter protested, but Judge Humphrey obeyed instructions, and thus Shanahan was unable to bid, through this failure of his plan. Upon this state of facts, Judge Barr refused to confirm the sale to appellants, and ordered a resale, the biddings to commence at $210,000, and from this decree the bidders at the sale have appealed.

Bennett H. Young, for appellants.

D. W. Fairleigh, A. P. Humphrey, and W. A. Sudduth, for appellees.

Before TAFT and LURTON, Circuit Judges.

After making the foregoing statement of facts, the opinion of the court was delivered by LURTON, Circuit Judge.

1. The objection that an appeal will not lie in favor of a purchaser at a master's sale from a decree refusing to confirm the sale and reopen the biddings is not well taken. Such a purchaser, though not entitled to be regarded as the owner of the property or to the benefit of his contract till after the master's report of the biddings has been confirmed, has nevertheless, by compliance with the terms of the sale, acquired what Chancellor Walworth called "inchoate rights" in the property, such as to entitle him to a hearing upon the question of reopening the biddings and to an appeal from any decree denying confirmation improperly. Delaplaine v. Lawrence, 10 Paige, 602. This question was expressly decided in Blossom v. Railroad Co., 1 Wall. 655, 656, where it was said:

"A purchaser or bidder at a master's sale in chancery subjects himself quoad hoc to the jurisdiction of the court, and can be compelled to perform his agreement specifically. It would seem that he must acquire a corresponding right

to appear and claim, at the hands of the court, such relief as the rules of equity proceedings entitle him to."

In Mining Co. v. Mason, 145 U. S. 349-365, 12 Sup. Ct. 887, an appeal was entertained by one who interposed, after confirmation, for the purpose of setting aside the sale and opening the biddings upon an advance bid made by himself.

2. Judicial sales under the decretal orders of an equity court are usually conducted by a special master appointed by the court and subject to its guidance. Any sale which that officer may make is not final until reported and confirmed by the court. Even after confirmation, the court may, for good cause shown, set aside the confirmation and reopen the biddings. But, to justify the reopening of the biddings after confirmation, a stronger case must be made than would be necessary before, both because it is the duty of one objecting to a sale to interpose before confirmation, as well as because the purchaser's rights are thereby much strengthened. Mining Co. v. Mason, 145 U. S. 349-367, 12 Sup. Ct. 887; White v. Wilson, 14 Ves. 151; Houston v. Aycock, 5 Sneed, 406.

In 1 Sugd. Vend. (9th Eng. Ed. 1836) p. 76, it is said:

"The determinations on this subject assume a very different aspect when the report is absolutely confirmed. Biddings are, in general, not to be opened after confirmation of the report. Increase of price alone is not sufficient, however large, although it is a strong auxiliary argument, where there are other grounds."

In respect to the circumstances which should be regarded as sufficient to reopen a sale before confirmation, over the objection of the bidder, the equity rules promulgated by the supreme court afford no express guide. It is true that the ninetieth rule adopts the rules of equity practice as they existed in 1842, so far as found consistent "with our local circumstances and conveniences." But, if we turn to the English practice in this matter at that time, we find it in a state of transition, if, indeed, there had ever been any uniform rule upon the subject. In 1 Sugd. Vend. (9th Eng. Ed.) p. 74, the learned author states:

"Where estates are sold before a master under the decree of a court of equity, the court considers itself to have a greater power over the contract than it would have were the contract made between party and party; and, as the chief aim of the court is to obtain as great a price for the estate as can possibly be got, it is in the habit of opening the biddings after the estate is sold."

He adds:

"Mere advance of price, if the report of the purchaser being the best bidder is not absolutely confirmed, is sufficient to open the biddings, and they will be opened more than once, even on the same application of the same person, if a sufficient advance be offered; but the court will stipulate for the price, and not permit the biddings to be opened upon a small advance, and, although an advance of 10 per cent. used generally to be considered sufficient on a large sum, yet no such rule now prevails."

In Andrews v. Emerson, 7 Ves. 420, decided in 1802, there was a motion to open the biddings upon an offer of an advance of £80 upon the sale of a lot for £800, being precisely 10 per cent. Lord Eldon said:

"That rule of ten per cent. was not a wise rule to establish. The consequences are, you never get more. I remember the time when no such rule

prevailed, and I desire it to be observed that in future there shall be no such rule."

But the report of that case shows that, when the advance bid was increased to £100, the biddings were reopened.

In White v. Wilson, 14 Ves. 151, where the effort was to reopen a sale after confirmation, the same great chancellor said:

"I could not do a thing more mischievous to the suitors than relax further the binding nature of contracts in the master's office; half the estates that are sold in this court being thrown away upon the speculation that there will be an opportunity of purchasing afterwards by opening biddings."

The practice was also condemned in Barlow v. Osborne, 6 H. L. Cas. 556.

Though the rule of opening the biddings on an advance of 10 per cent. only had ceased to prevail when our rules of equity practice were promulgated, yet it does appear that at that date a mere advance, deemed a sufficient inducement under all the circumstances of the case, was still regarded as sufficient to justify the reopening of biddings before confirmation. The objection so strongly stated by Lord Eldon, that "the speculation that there will be an opportunity of purchasing afterwards," had resulted "in sacrificing half the estates sold in the court," resulted finally in the regulation of the subject by Act 30 & 31 Vict. c. 48, whereby it was provided that the highest bidder in sale of lands by auction under decrees should be regarded as the purchaser, unless the court, for fraud or misconduct in the management of the sale, should order the sale to be reopened. The Irish practice appears to have been always to open the biddings when it was for the benefit of the estate to do so. Digby v. Browne, 1 Ir. Eq. 377; Mayne v. McCartney, 2 Ir. Eq. 324.

The English practice, allowing a reopening upon a mere advance bid, prevails in some of the states retaining the system of equity courts, notably in Tennessee. Atkison v. Murfree, 1 Coop. Tenn. Ch. 51; Click v. Burris, 6 Heisk. 539–545. But the English rule, that a mere advance bid would suffice to reopen biddings, has not been approved by the majority of American courts.

Mr. Perkins, the American editor of the 4th American Edition of Daniell's Chancery Pleading and Practice (volume 2, pp. 1285, 1286), has collected a great many authorities to support the proposition. In Graffam v. Burgess, 117 U. S. 180–191, 6 Sup. Ct. 692, Justice Bradley, in the course of a discussion of the general subject of judicial sales, said as to the rule of opening biddings upon a mere advance:

"In this country, Lord Eldon's views were adopted at an early day by the courts, and the rule has become almost universal that a sale will not be set aside for inadequacy of price, unless the inadequacy be so great as to shock the conscience, or unless there be additional circumstances against its fairness; being very much the rule that always prevailed in England as to setting aside sales after the master's report had been confirmed."

To sustain this, the learned justice cites a number of American cases.

In Mining Co. v. Mason, 145 U. S. 349–356, 12 Sup. Ct. 888, where it was sought to prevent confirmation by a number of objections, filed before confirmation, going to the practice of the court and the con-

duct of the sale, and where, also, an effort was made to set the sale aside after confirmation upon a large advance bid, the court said:

"It may be stated generally that there is a measure of discretion in a court of equity, both as to the manner and conditions of such a sale, as well as to ordering or refusing a resale. The chancellor will always make such provisions for notice and other conditions as will in his judgment best protect the rights of all interested, and make the sale most profitable to all; and, after a sale has once been made, he will, certainly before confirmation, see that no wrong has been accomplished in and by the manner in which it was conducted. Yet the purpose of the law is that the sale shall be final; and to insure reliance upon such sales, and induce biddings, it is essential that no sale be set aside for trifling reasons, or on account of matters which ought to have been attended to by the complaining party prior thereto."

Touching the effort to open the sale after confirmation upon an advance bid exceeding 10 per cent., the court, after discussing certain circumstances implicating the good faith of this effort, said:

"It is enough that it comes too late. Surely no one would suppose that an officer, having charge of the sale of property of such value,—a sale made at the end of prolonged litigation,—should, at the last moment, in response to a dispatch from a stranger, postpone the sale. The master's action was unquestionably proper, and, if the party desired the intervention of the court, his duty was to apply at once, and not wait until after confirmation; for then the rights of the purchaser are vested, and something more than mere inadequacy of price must appear before the sale can be disturbed. Indeed, even before confirmation, the sale would not be set aside for mere inadequacy, unless so great as to shock the conscience. See Graffam v. Burgess, 117 U. S. 180–191, 6 Sup. Ct. 686, where the matter is discussed at some length by Mr. Justice Bradley. As the price bid by the appellees, and at which the property was struck off to them, was about $580,000 in excess of the upset price, it is hardly necessary to say that there is no shocking inadequacy of price."

The reported circuit court cases are remarkably few, considering the frequency with which this question must have arisen. The earliest of them is Bank v. Taylor, Fed. Cas. No. 854, where the heirs of a mortgagor, in a case where a sale for foreclosure had occurred, objected to the confirmation upon the ground of a misapprehension at the sale, by which persons present were deterred from bidding by a statement, made within the hearing of the purchaser, and not denied by him, that the bidding was for the benefit of the mortgagor's heirs. It was shown that the property at the time was worth $2,000, and had been sold for $1,510. No advance bid was offered, but the biddings were reopened. In Blackburn v. Railroad Co., 3 Fed. 690, the biddings were reopened upon a large advance bid, and evidence that the property had sold for a grossly inadequate price, although there was no evidence of any fraud or unfairness in the sale. Judge Hammond conceded that the English rule of reopening biddings upon a mere advance bid had been generally repudiated by the American courts, which, instead, had adopted a rule "that there must be, besides an advance of price, some circumstance of unfairness in the sale, growing out of fraud, accident, or mistake, or trust relation of the parties, sufficient to avoid a sale between private parties." "This," said the learned judge, "is the doctrine which most commends itself to my judgment as being just and fair to all concerned, but I think this court must follow the English practice, particularly as the 'local circumstances and conveniences' mentioned in

the ninetieth equity rule favor it, and we have no power to resort to the method of reserved bids established in England since the equity rules were promulgated. Perhaps the court should not lose entire control of these sales in all cases where inadequacy of price appears as the only ground of objection to its confirmation; and, until the practice is in some way satisfactorily regulated, the best solution of the subject seems to be to hold closely to the public policy which protects the sales against instability by refusing to set them aside, unless the price offered in advance is so great, in proportion to the bid already made, that it affords substantial evidence that for some, perhaps unknown, reason, the property has been greatly undersold, —so much so that the purchaser has not simply a bargain, with a fair margin for profit, but an unconscionable advantage of the parties for whose benefit the sale has been made."

In Fidelity Trust & Safety-Vault Co. v. Mobile St. Ry. Co., 54 Fed. 27, Judge Toulmin refused to reopen biddings upon mere inadequacy of price. The question arose upon a motion to make absolute an order confirming the sale. The learned court said:

"The grounds of opposition to the motion, as stated, are inadequacy of price and unfairness in the sale. If the property sold at an inadequate price, the inadequacy must be so great as to shock the conscience and to excite the suspicion of the court, or there must be an inadequacy of price, with additional circumstances against the fairness of the sale, growing out of fraud, accident, or some trust relation of the parties. On the proof submitted as to the value of the property, I am not convinced that it sold at greatly less than its value; certainly the inadequacy of price is not so great as to shock the conscience and to excite the suspicion of the court. Mere inadequacy of price is not alone sufficient to set aside the sale, and the expression of opinion, however well founded, that the property on a resale would bring a much higher price, is not sufficient. Mining Co. v. Mason, 145 U. S. 349, 12 Sup. Ct. 887; Graffam v. Burgess, 117 U. S. 180, 6 Sup. Ct. 686. Are there, then, any additional circumstances against the fairness of the sale? Have the purchasers taken any undue advantage? If so, of whom? Has any party interested in the property been misled or surprised? There are some statements in the affidavits submitted, based on information and belief, that some of the buyers, who were bondholders, deterred other proposed buyers from bidding by creating the impression that they were going to bid $400,000 for the property, but these statements are too vague and indefinite for the court to act on them. The proposed purchasers are not named. What sum they were willing to pay for the property is not given. They do not testify in the matter. What was said by the buyers, or any of them, to create, or that tended to create, such impression, is not shown."

In Fidelity Insurance, Trust & Safe-Deposit Co. v. Roanoke Iron Co., 84 Fed. 752, Judge Paul adopted the rule that mere inadequacy of price was not sufficient, and held that, to justify the interference of the court, there must be some fraud, accident, or mistake by which the rights of the parties have been affected. In neither of the cases last cited was any advance bid tendered.

In Re O'Fallon, 2 Dill. 548, Fed. Cas. No. 10,445, and in Re Palmer, 13 Fed. 870, sales made by assignees in bankruptcy were set aside for inadequacy of price, but this practice was deemed authorized by the act of June 22, 1874 (18 Stat. 178), which gave power to the court "to set aside sales and order resales, so that the property sold shall realize the largest sum." The ninetieth equity rule has no such application as to make it obligatory upon a circuit court of the

United States to adopt and follow the English equity practice in force when those rules were promulgated, in respect to reopening biddings upon a mere advance bid. The English practice is only imposed by that rule "so far as consistent with our local circumstances and convenience." The English rule was merely one of expediency, adopted for the purpose of obtaining the highest possible price for estates sold under the orders and superintendence of the chancellor. After many years of experience, it was found not satisfactory upon the highest authority. Sales in the master's office were neglected upon the speculation that the biddings there were of no importance, and were subject to be reopened upon a mere advance. Thus, the advantage of an open competitive bidding was lost, with the result, said Lord Eldon, that "half the estates sold by the court were sacrificed." "Our local circumstances and convenience" do not so greatly differ from those which led the English people, through an act of parliament, to correct a practice which had been found so unsatisfactory. We are therefore absolved from any obligation to follow that unsatisfactory and abandoned practice, but can adopt one more likely to invite open competition and secure a better price. Such a course seems to have the sanction of the supreme court, so far as that court has spoken either judicially or extrajudicially. Mining Co. v. Mason, 145 U. S. 349, 12 Sup. Ct. 887; Graffam v. Burgess, 117 U. S. 180, 6 Sup. Ct. 686.

Upon the weight of American authority, we conclude that mere inadequacy of price, unless so great as to shock the conscience, will not justify the reopening of biddings. This rule seems to rest upon the plain necessity that it is to the interest of suitors that it shall be understood that some stability is to be given to the public sale of property by a master in equity, and that the report of sale will neither be set aside upon trivial circumstances, nor because it shall appear that the bidder has obtained a fair bargain and a reasonable profit. When it once comes to be understood that chancery sales will not be set aside upon a mere showing of inadequacy of price, and that the highest bidder at such sales may reasonably calculate that his purchase will be confirmed, unless, in addition to mere inadequacy, there shall also appear circumstances making it inequitable that he shall have the advantage of his bargain, we may hope that such sales will be attended by all intending purchasers, and such real competition will be brought about as will result in sales at the fair value of the property. On the other hand, it is not expedient that the court shall lose all control over such sales. As said by Judge Clark, in State of Tennessee v. Quintard, 47 U. S. App. 621, 26 C. C. A. 165, and 80 Fed. 829, the bid reported is "only an offer to take the property, and acceptance or rejection of that offer is within the sound legal discretion of the court."

A price so inadequate as to shock the conscience, or mere inadequacy, coupled with misconduct upon the part of those conducting the sale, or fraud, or conduct bordering upon fraud, upon the part of the purchaser, under the practice of both English and American courts, has always been regarded as furnishing good cause for reopening the biddings.

The difficult question arises when neither fraud nor misconduct exists in the case, but an inadequate price has been realized as a result of accidental circumstances, which have prevented a full or fair price from being realized. The case in hand is an illustration. No element of misconduct or fraud, or conduct bordering upon fraud, appears, and no criticism can be made upon the conduct of the purchaser or of those managing the sale. And yet, property which cost the company in excess of $2,000,000 has been sold for $160,000. It is true that the railroad was projected as a "boom" enterprise, and has never been completed. It is true that the value of such an unfinished and unneeded railroad is purely speculative. Yet 63 miles of steel-laid railway, with an equipment of rolling stock, has been sold for about $2,500 per mile, with 36 miles of right of way, upon which much work has been done, thrown in. That an upset price of only $160,000 was fixed by the court is little evidence of value. The practice of fixing a minimum, as is well known, is due to the desire of the court to protect minority creditors to some extent against the arbitrary power of the majority to carry out reorganization schemes for their exclusive protection and benefit, and to avoid, as far as possible, the necessity of countercombinations among the class of creditors less able to combine their interests. This modern practice of fixing an upset price differs much from the English reserve bid. Such a reserve bid was fixed confessedly upon the basis of a value ascertained upon evidence, and a report by the master, and the reserve was secret. If the highest bid did not equal this valuation, the master would, upon comparing the bid with the reserve, declare all bids rejected. 2 Daniell, Ch. Pl. & Prac. (4th Am. Ed.) pp. 1268–1271.

The fact that this property had been formerly offered upon an upset price of $500,000, without obtaining a bid, and that this price had been reduced to $250,000, without a sale, and finally reduced to $160,000, does undoubtedly indicate the great difficulty of realizing anything approximating the cost of this property. Upon the other hand, the property was once bid off at $301,000, and finally confirmed for $255,000. But the best evidence of an inadequate price is the fact that two advance bids were tendered to the circuit court, one for $200,000 and one for $210,000. An advance of $50,000 upon an original bid of $160,000 is clear evidence of great inadequacy of price. But, looking to the character of the property sold and the history of the repeated efforts to make a more satisfactory sale, we cannot regard the bid of appellants as so grossly inadequate as in itself justifying the court in reopening the biddings. But, coupled with an inadequacy of price not in itself sufficient to shock the conscience or raise an inference of fraud or misconduct, there is evidence that the accidental inability of two intending bidders to qualify themselves as bidders, by making the large deposit required under the decree of sale, directly resulted in a sale without competition, and at a price greatly less than the property would have brought but for the circumstances mentioned. The deposit required, in view of the very low upset price, was a large one. In consideration of the history of the former sales, we are not, however, disposed to criticise the court for settling the deposit at so large a

figure. Still, the sum was a large one, and the inability of two bidders upon the ground to comply with the order has brought about a most unsatisfactory result to the creditors interested in the sale. But, if this was due to the total inability of these intending bidders to make such a deposit, there would be no ground for complaint by any one. But that was not the case with these bidders. But for purely unforeseen and unexpected circumstances, each would have been able to have qualified himself as a bidder. One was the largest mechanic's lien creditor, and had a claim of the class second next after costs, expenses, and receiver's debts. The other was the then owner of the property, and was liable for any deficiency between his former bid and that which should be realized at the pending sale. Each had, as he supposed, prepared himself to make the necessary deposit, and both were disappointed at the last moment by the failure of those upon whom they had reasonably relied for the means necessary to make the deposit. It is easy to suggest that each might have avoided such disappointment if he had done something different from that which he did do. But this demands too severe a standard, under the circumstances of this case. The facts have been stated, and need not be repeated. Our judgment is that each had, in good faith, perfected business arrangements,—arrangements so reasonable as to justify the conclusion that the fact that they fell through at the critical moment is not sufficient to convict them of culpable negligence. That each was earnestly determined to push this property much above the upset price, and that each, in good faith, supposed he had prepared himself to bid, is satisfactorily shown. The result of the curious chapter of accidents by which one found himself unable to bid but a moment before the property was cried, though he had every reason to rely upon the safety of his plans, while the other, by the default of his correspondent, was not advised of his right to use the certified check prepared for the occasion until just after the sale was closed, has been that a most unfair price has been secured, and a great loss sustained by every one interested in the property, including these intending bidders. Accident, mistake, or surprise, without fault, is a recognized ground for equitable relief in such cases. The definition of "accident" given in Smith, Man. Eq. Jur. p. 36 (a definition approved in Pom. Eq. Jur. p. 285), is this: "An unforeseen and injurious occurrence, not attributable to mistake, neglect, or misconduct." Story thus defines it: "By the term 'accident' is intended, not merely inevitable casualty, or the act of Providence, or what is called technically 'vis major,' or 'irresistible force'; but such unforeseen events, misfortunes, losses, acts, or omissions as are not the result of any negligence or misconduct of the party." Story, Eq. Jur. § 78.

The facts bring this case under either definition. Through an unforeseen failure of arrangements, upon which these bidders could have reasonably relied, this property has been sacrificed. Relief in such cases, by reopening the biddings, is not extended because a party who desired to buy has probably lost a bargain. The ground for relief is the loss sustained by those interested in the sale of the property at its best price. All, or about all, of the creditors of this

hopelessly insolvent railway unite in asking to have the biddings reopened.. The purchaser at the master's sale only objects. Under such circumstances, ought this bid to have been accepted? There is a margin within which the sound legal discretion of the circuit court will not and should not be disturbed by an appellate court in such matters. There was no abuse of the legal discretion which may be reasonably exercised where a greatly inadequate' price has resulted ·from circumstances which could not have been reasonably foreseen. The equity of the owners and creditors, under the facts of this case, is greater' than the equity of the purchasers to have this bid accepted. Neither is the stability of master's sales disturbed by reopening the biddings, where a greatly inadequate price has resulted from accident, mistake, or surprise, without fault of those applying for a resale. The supreme court seems to recognize such a rule as sound and expedient. Mining Co. v. Mason, 145 U. S. 349, 12 Sup. Ct. 887; Graffam v. Burgess, 117 U. S. 180, 6 Sup. Ct. 686. It has the support of the practice in the circuit courts, so far as that is ascertainable by the reported cases. Bank v. Taylor, Fed. Cas. No. 854; Blackburn v. Railroad Co., 3 Fed. 690; Fidelity Trust & Safety-Vault Co. v. Mobile St. Ry. Co., 54 Fed. 27; Fidelity Insurance, Trust & Safe-Deposit Co. v. Roanoke Iron Co., 84 Fed. 752.

Under the English practice, no advance of price after confirmation was deemed sufficient, but such advance was deemed a strong auxiliary, if there also appeared other circumstances. 2 Daniell, Ch. Pl. & Prac. (4th Am. Ed.) p. 1288; 1 Sugd. Vend. (9th Eng. Ed.) 76, 77. Thus, biddings were opened after confirmation, upon an advance bid, upon the ground that the owner of the property, who joined in the motion, was in prison at the time of confirmation, and was told by two persons that they would direct their agent to open the biddings. Watson v. Birch, 2 Ves. Jr. 50. This case was criticised by Lord Eldon in Morice v. Bishop of Durham, 11 Ves. 57; and in White v. Wilson, 14 Ves. 151, the rule was laid down that no sale, after confirmation, would be disturbed, unless there was misconduct upon the part of the person obtaining confirmation. But, as an illustration of "accident, fraud, or mistake," it is of value as an authority, under a practice which allows a reopening of biddings before confirmation upon such ground. In Williamson v. Dale, 3 Johns. Ch. 290, Chancellor Kent, though refusing to adopt the English practice of opening biddings before confirmation, ordered a resale upon the ground of surprise; it appearing that the owner of the property was innocently misled and induced to believe that the premises would not be sold upon the day appointed. In Roberts v. Roberts, 13 Grat. 639, a sale was set aside upon the ground that, on account of the great inclemency of the weather, several intending bidders were kept away. The purchaser was the only bidder present, and he lived upon the premises. In Dewey v. Linscott, 20 Kan. 684, biddings were reopened where the mortgagee's agent had instructions to bid the property to its value and was unable to attend, being called away under judicial process, the property having sold at a greatly inadequate price. In Littell v. Zuntz, 2 Ala. 256, a sale after confirmation was set aside, having been made during the prevalence of a yellow

fever epidemic. In Seaman v. Riggins, 2 N. J. Eq. 217, a sale was set aside on application of a second mortgagee, who had been innocently misled as to the place of sale, and had, on that account, not been present. That the purchaser who stood fair before the court should be reimbursed his costs and reasonable expenses is clear. This those resisting confirmation offered to do, and this was directed by the decree reopening the biddings. The practice was right. Williamson v. Dale, 3 Johns. Ch. 290. The decree will in all respects be affirmed.