FIDELITY INSURANCE, TRUST & SAFE DEPOSIT CO. v. ROANOKE
IRON CO.

(Circuit Court, W. D. Virginia.    July 22, 1897.)

1. JUDICIAL SALES—PENDENCY OF OTHER LITIGATION.
    Where a large manufacturing plant is lying idle, and rapidly deteriorating,
    in the hands of a receiver, the mere fact that litigation is pending in another
    court, involving the title to the land on which the plant is situated, is not
    an insuperable objection to ordering a sale, if the court, in its best judg-
    ment, believes that the interest of the creditors will be best conserved
    thereby.    Nor is it any ground of objection to confirmation of such a sale
    that the commissioners gave notice at the time of sale of the pendency of
    such suit, with the honest purpose of informing bidders as to the condition
    of the title.

2. SAME—PAYMENT OF PURCHASE MONEY.
    The court will not refuse confirmation of a sale on the ground that the
    purchaser has not made the full cash payment required by the decree,
    where it appears that he has paid a substantial sum, and there is no reason
    to suppose that he will not pay the balance on confirmation.    A resale will
    be ordered only when the court finds that the purchaser will not pay the
    balance due.

3. SAME—INADEQUACY OF PRICE.
    A sale will not be set aside for inadequacy of price, unless it is such as to
    shock the conscience.

On a motion to confirm the sale of the defendant company's property.

Watts, Robertson & Robertson, for purchaser.
Griffin & Glasgow, for certain creditors of defendant company.

PAUL, District Judge.    Acting under a decree of sale entered in
this cause on the 27th day of February, 1897, and a supplemental de-
cree of April 14, 1897, the special commissioners appointed to sell the
property of the defendant company sold the same on the 28th day of
June, 1897, and filed their report on the 30th of the same month.    On
the 8th day of July, 1897, on motion of Robert E. Tod, the purchaser, a
decree nisi was entered on said report as follows:

"And now, this 8th day of July, 1897, at the city of Lynchburg, this cause
came on to be heard upon the papers formerly read, upon the report of Special
Commissioners David W. Flickwir and H. Peyton Gray, of the sale of the plant
of the Roanoke Iron Company, as directed by the decree entered herein on the
27th day of February, 1897, which said report was filed on the 30th day of
June, 1897, and on motion of Robert E. Tod, by counsel, the purchaser of said
property, to confirm the said sale.    Thereupon the court doth adjudge, order,
and decree that the sale of said property, as set out in the aforesaid report of
Special Commissioners David W. Flickwir and H. Peyton Gray, filed herein
on the 30th day of June, 1897, be, and the same is hereby, confirmed, unless
good cause be shown why the same should not be confirmed on or before the
20th day of July, 1897; and the court doth fix the 20th day of July, 1897, as
the time, and the United States court room at Harrisonburg, Virginia, as the
place, for the consideration of any objection that may be made to the con-
firmation of said sale, within the time above specified."

Exceptions were filed to the report of sale by Joseph L. Buery and
others, creditors of said Roanoke Iron Company.    The court will con-
sider these objections to a confirmation of the sale in the order in which
the exceptions are taken:

First. "Because the sale was made when a cloud rested upon the title to the property sold, created by a suit then pending in the supreme court of appeals of Virginia, in which a claim to the land on which said plant is located, adverse to said company, was made and undetermined." This objection to a sale of the property was raised before the decree of sale was entered, but the court did not think the objection would justify it in delaying a sale which was being actively urged by other creditors. This court had no control over the suit pending in a wholly different jurisdiction. It could take no step to hasten a decision of the questions involved in that case, and it might be years before they were settled; and, when settled, the court had no assurance that the conclusions would be favorable to the interests of the creditors in this cause. In the meantime the property was lying idle, deteriorating in value, and requiring constant expenditures to preserve it from damage and waste. The court, in the exercise of its best judgment in the premises, thought the interests of the creditors in this cause would be best conserved by a sale, and so decreed. If the court erred, its action is subject to appeal. But the court does not think this objection can be properly considered by it after the decree of sale has been carried into effect, and the only question before the court is the confirmation of the sale.

Second. "Because the offer for said property by Robert E. Tod, whose bid is reported to the court, is a grossly inadequate price for the same." In support of this exception, the exceptants file the affidavit of one of their number, Joseph L. Buery, which is as follows:

"This day personally appeared before me, A. K. Fletcher, clerk of the circuit court of the United States for the Western district of Virginia, J. L. Buery, who made oath that he is a creditor of the Roanoke Iron Company, holding the bonds of said company to the amount of $12,000; that he is also a stockholder in the Mill Creek Coal & Coke Company, which is the owner of the bonds of the said Roanoke Iron Company to the amount of $24,000; that he is well acquainted with the property of the said Roanoke Iron Company, and that it appears by exhibit filed by the receiver in this cause that the plant of said company was valued at the sum of $534,546.21. This includes the real estate, furnace plant, rolling-mill plant, shops, stables, etc. Affiant further says that said plant was reported by said receiver as in good condition, except the lining of the stack of the furnace (which has since that time been relined and put in good condition), so that the whole property is now completely repaired and in good condition; that the sale reported as having been made by the commissioners in this cause was made at a time when the iron industry had reached a condition of depression and uncertainty such as affiant believes has never before existed, and which affiant does not believe to be permanent. Affiant further says that before the biddings were opened at said sale it was publicly announced by the solicitor for the commissioners of sale that a suit was pending in which a claim was made to the land on which the plant is located, or a large part thereof; that said suit was decided adversely to said claimants in the lower court, and that an appeal had been taken to the supreme court of the state. This announcement was followed by a statement made by an attorney for said claimants that said appeal was pending in said court of appeals, and would probably be heard at the January term of said court. Affiant further says that the price obtained for said property is grossly inadequate, and, if the sale is confirmed at that price, affiant and other bondholders of said company will realize nothing from said sale."

In support of the motion for confirmation the purchaser files the following affidavits:

"State of Pennsylvania, County of Allegheny—ss.: Before me, a notary public in and for said county, personally appeared Minor Scovel, who, being duly

sworn according to law, says that he is a resident of the city of Pittsburg, and a mechanical engineer by profession; that in the practice of his profession he has been engaged for a number of years in the repairing and constructing of blast furnaces and rolling mills, and is therefore thoroughly familiar with the construction, cost, and operation of the same; that in his opinion the improvements in manufacturing and construction, and the correspondingly largely increased output, has resulted injuriously to many establishments erected before said changes, and that by reason of the same numberless plants and establishments in the United States are either rendered useless, or incapable of manufacturing iron at a profit, under the present prices, and that in addition thereto the restricted market and the discouragements to be met with in the undertaking of the manufacture of iron at present have and will deter persons from embarking in the said manufacture; that the above circumstances, taken together in many cases, prevent a sale of such manufacturing property at any price, and that about the only purchasers left for the same, in the present conditions and circumstances, are people who propose to wreck and remove the same, and dispose of the parts thereof as scrap and old material; that he is familiar with the conditions existing at Roanoke and in the vicinity, and that in his opinion in the circumstances, and for the reasons given above, the price or sum of fifty-seven thousand seven hundred dollars ($57,700) offered for the Roanoke Iron Company's property, at a public sale thereof by the commissioners, was a full, fair, and adequate price for the same, and as much, if not more, than the property could possibly be sold for to any other person, and probably more than could be obtained at a later date for the same.

"[Signed]    Minor Scovel.

"Sworn to and subscribed before me this 6th day of July, 1897.
"[Signed]    M. B. Bates, Notary Public."

"State of Pennsylvania, County of Allegheny—ss.: On this sixth day of July, A. D. 1897, before me, a notary public in and for said county, personally came John F. Wilcox, who, being duly sworn according to law, says that he is a resident of the city of Pittsburg, state of Pennsylvania; that he is a mechanical engineer by profession, and has been engaged in said profession for the term of 25 years last past; that in the practice of his profession he has been employed in the construction, erection, and operation of blast furnaces and rolling mills, and is therefore fully familiar with the cost and value of the same. He further says that great and radical changes and improvements have been made in the construction of such establishments, and in the method of the operation of the same, within the past three or four years, by reason of which the output has been greatly increased, and the cost of production largely decreased, and that by reason of such changes, and the advantages accruing to certain locations, that the industry is being centralized, to the detriment of many other districts; that the present stagnation in the iron trade, the largely decreased demand, and restricted markets have caused the suspension of operation in many of such manufacturing establishments, and in many cases led to the same being offered for sale at great sacrifices, in many cases the only purchasers available for the same being persons contemplating the dismantling and removal of the same for sale in parts and as scrap, and, even for such purposes, buyers can be had for the same only at greatly reduced prices. And affiant avers that in consideration of all the above particulars and circumstances, that the price of fifty-seven thousand seven hundred dollars ($57,700), for which the Roanoke Iron Company's property was recently sold at public auction by the commissioners under order by court, was the highest price that could be expected for the same, and better than, in his opinion, could be obtained at private sale, and a higher one than could be obtained for the property later, as the said property is constantly deteriorating and getting out of repair, by reason of the suspension of operations.

"[Signed]    Jno. F. Wilcox.

"Sworn and subscribed before me the day and year aforesaid.
"[Signed]    W. B. Bates, Notary Public."

"State of Pennsylvania, County of Allegheny—ss.: Before me, a notary public in and for said county, personally came John Reis, who, being duly sworn according to law, says that he is a resident of Allegheny county, Pennsylvania,

and a blast furnace manager by profession, and that he has been engaged in the same for the past fifteen (15) years, and is thoroughly familiar with the manufacture and production of pig iron; that he is thoroughly acquainted with the latest improvements in the construction of furnaces, and the method of pig-iron production, and that the same have been many and radical, notably within the past three years; that by reason of the said improvements and the changes in the methods, and decrease in selling prices of material and improved transportation facilities, that great advantages are gained by blast furnaces in certain localities; that, in addition to all of the above, the depression in the trade, and the decrease in the demand for product, has rendered many establishments idle throughout the country, and caused the withdrawal of large amounts of capital from the industry; that in all the circumstances, and by reason of the changed conditions above specified, the price or sum for which the Roanoke Iron Company property was sold by the commissioners, viz. fifty-seven thousand seven hundred dollars ($57,700), was as large as could probably be obtained for the same from any person, and more than the same would bring at private sale, and more than could be obtained at a later date, unless large sums were expended for the maintenance of the property against depreciation and decay.

"[Signed]                                                                    John Reis.

"Sworn to and subscribed this 6th day of July, 1897, before me."
      "[Signed]                                               W. B. Bates, Notary Public."

While the record shows a wide difference between the estimated value of the property as reported by the receiver when he took charge of it and the price for which it sold, yet, in view of statements contained in the affidavits, and the known decline of many kinds of property, notably furnace property, constructed in the "boom" period of a few years ago, the inadequacy of the price realized for this property does not shock the conscience. The record shows that the Buerys and Cooper, who now object to the confirmation of the sale, leased this property in 1895, and operated it for a time, but found their losses so heavy that they petitioned the court to be released from their contract, and agreed to pay the sum of $5,000 to be relieved from its performance, and, on the payment of this sum to the receiver, the lease was canceled by the court. This seems to the court very strong evidence of the fact that the property cannot now be operated at a profit.

The supreme court in Graffam v. Burgess, 117 U. S. 180, 6 Sup. Ct. 686, has stated the doctrine as follows: "A judicial sale of real estate will not be set aside for inadequacy of price unless the inadequacy is so great as to shock the conscience, or unless there be additional circumstances against its fairness." To the same effect is the holding of the court in Mining Co. v. Mason, 145 U. S. 349, 12 Sup. Ct. 887. The grounds for setting aside a sale are thus stated in 2 Beach, Mod. Eq. Prac. § 821: "To justify the interference of the court, there must be fraud, mistake, or some accident by which the rights of the parties have been affected." "It has never yet been decided that mere inadequacy of price was a sufficient reason, of itself, to open a sale." Id. § 824.

There is no pretense of fraud, mistake, accident, or unfairness of any kind in the conduct of the commissioners making the sale, or of any party connected with it, or interested in the suit, unless the objectors intend that such fraud, mistake, or unfairness is shown by exception third, which is as follows:

"Third. Because at said sale, and before the biddings were opened, it was publicly announced by the solicitor for the commissioners of sale that a suit

was pending in which a claim was made to the land on which the plant is located, or a large part thereof; that said suit was decided adversely to said claimants in the lower court, and an appeal had been taken to the supreme court of appeals of the state. This announcement was followed by a statement made by an attorney for said claimants that said appeal was pending in said court of appeals, and would probably be heard at the January term of said court. These statements showing pending litigation over the title of said property were well calculated to deter bidders, and in fact, as shown by the report of sale, only one bid was made, and that the lowest the commissioners would receive."

The court is at a loss to see on what principle an honest statement of the condition of the title to the property, made by the commissioners making the sale, can be made a ground for setting the sale aside. To know the condition of the title to the property offered for sale is the unquestioned right of every proposed purchaser, and the commissioners only gave the information to which the bidders were entitled. There is no evidence and no charge that this information was given with a fraudulent intent or to depress or injure the sale, or that it had that effect. The counsel for the claimants of the land in the suit in the state court were present, and made the same statement as the commissioners as to the condition of that litigation. The fact of the existence of the suit in the state court was known to every one connected with this suit, and the parties, one or more of whom was present at the sale, who now object to a confirmation of the sale, knew of it, because they were parties to the objection to a decree for a sale because of the pendency of the suit in the state court.

Fourth exception: "Because the terms of sale, as shown by the report, have not been complied with by the purchaser, by making of the cash payment required by decree of sale." The commissioners report that the purchaser, Tod, has paid, on account of the purchase price, the sum of $5,000 in partial settlement of the amount bid by him, and that the residue of his bid will be paid on confirmation of the sale. There is no evidence before the court of the inability or unwillingness of the purchaser to pay the purchase money. The court has the power to enforce the agreement of purchase, and it is only after the court finds that the purchaser will not pay the balance of the purchase money that it will order a resale of the property, and require the purchaser to pay the expense arising from the noncompletion of the purchase, the application, and resale, and any deficiency in price arising upon the second sale. 3 Beach, Mod. Eq. Prac. § 828; Mayhew v. Land Co., 24 Fed. 205.

As there was no fraud or unfairness in this sale, and no advance bid being offered or guarantied, the court has no assurance that on a resale the property would bring more, or even as much, as realized at the sale made. The commissioners in their report say: "Your commissioners believe that this was a fair sale, and the price, under all the circumstances, is adequate, and they recommend the confirmation of the sale." In the facts before it the court sees no ground whatever for setting aside the sale, subjecting the creditors to the hazard of a resale, jeopardizing their claims, and delaying their collection. The exceptions to the report will be overruled, and the decree of confirmation entered.