## In re NATIONAL MINING EXPLORATION CO.

(District Court, D. Massachusetts. August 17, 1911.)†

### No. 16,396.

1. BANKRUPTCY (§ 261*)—SALE OF REAL ESTATE—PUBLICATION—STATUTES— APPLICATION.

Act Cong. March 3, 1893, c. 225, 27 Stat. 751 (U. S. Comp. St. 1901, p. 710), providing that no sale of any real estate under any order, judgment, or decree of any United States court shall be had without previous publication of notice once a week for at least four weeks prior to such sale, etc., does not bind courts of bankruptcy in selling real property belonging to a bankrupt corporation under Bankruptcy Act July 1, 1898, c. 541, 30 Stat. 544 (U. S. Comp. St. 1901, p. 3418), and hence where the notice of sale of real property of the bankrupt was first published for 25 instead of 28 days before the sale, and notices of subsequent adjournments from February 28, 1911, until May 25th following, were duly published, confirmation of the sale would not be denied because of want of sufficient notice.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 361, 362; Dec. Dig. § 261.*]

2. BANKRUPTCY (§ 263*)—SALE OF REAL ESTATE—PRESENCE OF TRUSTEE.

Where the estate of a bankrupt mining company was being administered in Massachusetts, and it was necessary to sell certain real property in Arizona, it was not essential to the validity of the sale that the trustees should have gone to Arizona and personally conducted a sale, but they were authorized to employ an auctioneer and leave the conduct of the sale to him; they receiving the deposit required of bidders and the balance of the purchase money.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 263.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Received for publication January 25, 1912.

3. BANKRUPTCY (§ 263*)—SALE OF REAL ESTATE—BID.

That a bid for real estate sold by a bankrupt's trustee was made by a firm of lawyers employed by the purchaser for that purpose, and that such firm had acted as counsel for the bankrupt and the trustee in rendering certain legal services required locally, but had no connection with .the bankruptcy proceedings, was not material to the validity of the sale.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 263.*]

4. BANKRUPTCY (§ 263*)—SALE OF ASSETS—REAL PROPERTY—PURCHASER—INTEREST OF TRUSTEE.

That one of three trustees of a bankrupt was a stockholder in and a director and a treasurer of a new corporation organized to purchase the bankrupt's real property did not affect the validity of the sale; the creditors having appointed him with full knowledge of his connection with the bankrupt, and the new company having been promoted by the reorganization committee of the bankrupt's creditors for the purchase of the property, and all ·the bankrupt's stockholders having been given the full opportunity to participate.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 263.*]

5. BANKRUPTCY (§ 269*)—SALE OF REAL PROPERTY—PRICE—ADEQUACY.

Where a bankrupt mining company's property consisted of certain patented and unpatented mining claims in Arizona scheduled as of uncertain value, and certain machinery, tools, cars, and plants, the book value of which was given in the schedules at $22,791.27, and more than $300,000 had been expended in attempting to develop the claims, a sale thereof for $50,000 was not so inadequate as to justify vacation on that ground; no actual offer from any source to pay a higher price having been received.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 269.*]

6. BANKRUPTCY (§ 266*)—SALE OF ASSETS—CONFIRMATION—PAYMENT OF PRICE.

That a purchaser of a bankrupt's real property had not paid to the trustees the balance of the purchase price was no ground for refusing confirmation, since the failure to seasonably comply with the requirements of the sale and pay the balance due would warrant vacation of the confirmation and an order setting aside the sale and forfeiting the deposit.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 266.*]

In the matter of bankruptcy proceedings of the National Mining Exploration Company. On petition to review a Referee's order confirming a trustee's sale of real estate. Affirmed.

Charles M. Bruce, pro se.
Tyler & Young, for trustees.

DODGE, District Judge. The bankrupt in this case is a mining corporation. Its property, consisting of certain patented and unpatented mining claims in Gila and Graham counties, Ariz., scheduled as of "uncertain" value, and certain machinery, tools, cars, and plants thereon whose value is given in the schedules as "book value $22,-791.27," is subject to a mortgage deed of trust securing the issue of $250,000 face value 6 per cent. bonds due October 1, 1918. N. L. Amster holds its note for $100,000 payable September 24, 1910, secured by this entire issue of its bonds. It was adjudicated bankrupt on its own petition September 23, 1910.

Frank A. Woodward, Arthur Wainwright, and Francis M. Ed-

wards qualified as trustees October 7, 1910; each giving bond in the sum of $10,000. On October 17, 1910, they petitioned the referee to order the sale of all the mortgaged property, and that the sale might be in accordance with an agreement in writing, set forth, between Amster and a reorganization committee of the bankrupt's creditors.

November 2, 1910, after due notice and hearing, the referee ordered:

The property to be sold as a single parcel, at a date in the last week of February, 1911, to be thereafter fixed by the court, in Boston "or, if required by law, in the territory of Arizona."

Notice of the sale to be given before that date, as required by law.

The sale to be free of incumbrances, at public auction, to the highest bidder, without reserve, not to be postponed save for imperative reason, nor in any case for more than 10 days without notice to Amster.

The proceeds to be applied to payment of expenses, discharge of various liens and incumbrances, and then to payment of Amster's secured note, upon terms and conditions prescribed, but which need not be here recited.

January 23, 1911, Amster, as a creditor, filed a petition that the court fix a date in the last week of February for the sale. January 24, 1911, an order was entered fixing February 28th, and directing the sale to be on the premises in Globe, Ariz. The trustees were directed by this order to give notice of the sale by publication once a week for at least four weeks prior to said date, and by mail to all creditors. The order further provided that any purchaser should be required to deposit $5,000 with the trustees, to be forfeited in case the sale was not completed.

February 27, 1911, the trustees filed a petition representing that it was expedient and for the best interest of the estate that they be authorized to postpone the sale, and asking authority to postpone it from time to time and for such periods of time as in their discretion they might determine, provided that Amster should consent to such postponement. An order granting such authority to postpone was made on the same day, without notice.

June 5, 1911, the trustees filed a petition reciting that they had duly advertised the sale for February 28, 1911, at 11 a. m., at the mouth of the Iron Cap Shaft, on the property at Globe, that the sale was adjourned by order of court to March 30, 1911, at the same time and place, again adjourned to May 1, 1911, at the same time and place, and again adjourned to May 25, 1911, at the same time and place; also, that notice of the sale and the several adjournments had been published in Arizona papers named. Affidavits of publication and notice were annexed. The petition further alleged that the property was sold at 11 a. m. on May 25, 1911, to the highest bidder; that the Iron Cap Copper Company, a Maine corporation, was the highest bidder and became the purchaser for $50,000; and that the trustee had received $5,000 from the purchaser as directed by the order of January 24th. A certificate from the auctioneer was annexed. It

was further stated that the Iron Cap Company had become owner of Amster's note and was prepared to comply with the provisions of the various orders having reference thereto; these having been meanwhile in some respects modified by an order entered June 5, 1911. The petition, which was sworn to by the trustees, concluded with a prayer that the sale be confirmed upon payment to them of the unpaid balance of the purchase price.

Before this petition for confirmation was filed on June 5th, Charles M. Bruce, alleging himself to be a creditor of and stockholder in the bankrupt company, had, on May 31, 1911, filed a protest against confirming the sale, wherein he set forth in substance the objections thereto now raised by him in his petition for review below mentioned.

On July 7, 1911, the referee confirmed the sale, after due hearing at which Mr. Bruce presented his objections and evidence in support of them. He now asks the court to overrule and vacate the order of confirmation.

The secured debts, as scheduled by the bankrupt, are, besides Amster's note for $100,000, secured by the bond issue of $250,000, in its turn secured by the mortgage above described—two claims of $2,500 each, each secured by 12,500 shares of the bankrupt company's stock. The unsecured debts as scheduled are $35,450.28. The petitioner for review is not scheduled as a creditor, but it is not disputed that he has proved a claim, not yet allowed, for $333. His petition for review alleges that he is a "large stockholder" in the bankrupt company. As a stockholder it may be doubted whether he has any standing to oppose the sale, independently of the bankrupt itself, on whose behalf there is no opposition. The bankrupt's interest in opposing it would appear to be slight under the circumstances, and creditors or persons desiring to purchase, to be the only persons whom the decision can affect. There is no other petitioner for review of the referee's order. There has been no opposition to the sale on Amster's part.

The objections to the sale are set forth in the petition in the form of (1) a complaint that the referee excluded certain evidence offered; (2) requests for rulings made at the hearing and in effect denied by the order. The order is alleged to be against the law and the facts shown by the evidence. I shall deal directly with the substance of the objections raised.

[1] It is said that the sale was not advertised as ordered. There was publication in each of the four weeks before February 28, 1911, but the first publication was on February 3d, 25 instead of 28 days before the sale. The Act of March 3, 1893 (27 Stat. 751) requires publication once a week for at least four weeks before the sale, as did the order of January 24th, and this statutory requirement was construed to mean 28 days at least, in Wilson v. North Western, etc., Co., 65 Fed. 38, 12 C. C. A. 505—a Court of Appeals decision, and the only one upon the question. If the statute applies here, the decision is binding upon this court. But although the statute purports to govern all sales of real estate by the federal courts, I agree with the decision in Re Edes (D. C.) 135 Fed. 595, that it does not bind

those courts in their administration of the later bankruptcy act of 1898. I do not think I am bound to construe the referee's order so as to make this sale void for noncompliance with it. There is a construction of the terms of the order, by no means without sanction of authority and of usage, according to which the publication proved is sufficient. This I shall adopt, in the absence of reason to believe that publication three days earlier could have made a real difference for any purpose. Notice of the adjournment to March 30th was published March 24th, and of the adjournment to May 1st on April 25th and 28th, of the adjournment to May 25th on May 16th and 19th, in the Arizona papers respectively which had contained the original advertisement. I see no reason to doubt that there was sufficient notice of the adjournments, nor any reason for holding that notice or report of each ought to have been sent to or filed with the referee at Boston.

[2] The trustees were not present at the public sale on May 25th. They employed an auctioneer and left the conduct of the sale to him. It is urged that they were the only persons authorized to make the sale and that they did not make it. A bankruptcy trustee or receiver cannot turn over the whole control and management of such a sale, including receipt of the purchase money, to another. See Mason v. Wolkowich, 150 Fed. 699, 80 C. C. A. 435, 10 L. R. A. (N. S.) 765. But he may employ agents to act under his control and direction in regard to a sale, as he may for any other purpose in connection with his administration of the property, when it is reasonably necessary. See Woodman, Trustees in Bankruptcy, § 56. Clearly an auctioneer may be employed to conduct an auction ordered to be had, and it may well have been to the estate's advantage that trustees' expenses in going to and from Arizona were not incurred merely to have the bids made and have the result announced in their hearing. They received the deposit required of bidders. They will receive the balance of the purchase money, if paid. I see no weight in this objection.

[3] The Iron Cap Company's bid was made by a firm of lawyers doing business in Globe, employed by it for the purpose, and it is objected that the same firm were counsel for the bankrupt or the trustees. No retainer or permanent employment by either is shown, though both had employed this firm from time to time for necessary legal services to be locally rendered. I see nothing in the fact that the bid was so made to show any improper connection with it on the part of the bankrupt or the trustees. The lawyers referred to have had no connection with these bankruptcy proceedings, so far as appears.

[4] Woodward, one of the three trustees, was also a stockholder in, and a director and the treasurer of, the Iron Cap Company. He was also president and director of the bankrupt company. It is claimed that the Iron Cap Company cannot lawfully purchase from trustees of whom he was one. Undoubtedly one who is the only trustee of a bankrupt estate cannot buy the property of the estate from himself. Re Hawley (D. C.) 117 Fed. 364. Undoubtedly also a trustee must serve no other interest save that of the creditors whom he

represents. Re Wrisley Co., 133 Fed. 388, 66 C. C. A. 450. But I do not believe that all this requires me to set aside this sale for no other reason than Woodward's connection with the Iron Cap Company. There were two other trustees without whom he could not have acted. The creditors appointed him with full knowledge of his connection with the bankrupt company. The organization of the Iron Cap Company was promoted by a reorganization committee of the bankrupt's creditors for the purpose of making this purchase. All the bankrupt's stockholders who chose to do so were given full opportunity to participate, and most of them have accepted the opportunity offered. A trustee's sale is not invalid because the bankrupt is the purchaser. The purposes of the Iron Cap Company have been openly announced by circulars, and have been generally understood since its organization in October, 1910, as has been also Woodward's connection with the company; but there has been no suggestion that he had become disqualified as trustee by reason of them. These are facts to be taken into consideration upon the question whether or not there has been concealment or bad faith regarding the sale, but I must agree with the referee that they are not sufficient to defeat its confirmation.

[5] The purchase price of $50,000 is claimed to be inadequate. To justify setting aside the sale on this ground, the inadequacy must appear so great as fairly to raise a presumption of fraud. Sturgiss v. Corbin, 141 Fed. 1, 72 C. C. A. 179. Nothing of the kind can be said to appear in regard to this property. Its value was and is almost entirely prospective and speculative. The bankrupt, organized in 1905, had become heavily insolvent, as has been stated, in the attempt to develop it, having expended $300,000 or more. So far from there being reason to believe that a materially higher price can be obtained, there has been no actual offer from any source to pay any higher price. See Re Shea (D. C.) 122 Fed. 742; Id., 126 Fed. 153, 61 C. C. A. 219; Ballentyne v. Smith, 205 U. S. 285, 27 Sup. Ct. 527, 51 L. Ed. 803.

After consideration of the evidence before the referee, including that excluded by him against objection, and giving due weight to the admitted connection of one of the trustees with the Iron Cap Company, I am unable to find, against the referee's conclusion, that any deception, concealment, or fraud on the part of counsel, officers, or committees in connection with this sale has been proved. I see no reason to believe that there was any stifling of competition or any attempt to stifle competition. Had there been a possible purchaser really prepared to make a higher bid, and only prevented from doing so because he did not know when the sale would be had, I think he would have been heard from. I can find no reason to doubt that the creditors whose interest is the interest here most to be considered, approve the sale, generally speaking; nor can I believe that refusal to confirm would be for their interest.

[6] That the Iron Cap Company has not, before confirmation, paid to the trustees the balance remaining due of the purchase price, does not constitute a reason against confirmation. Fidelity, etc., Co. v.

Roanoke, etc., Co. (C. C.) 84 Fed. 752. The same applies to the terms and conditions of the order of sale concerning the Amster note. There will be no conveyance to the Iron Cap Company except upon the terms prescribed. Failure on the part of the Iron Cap Company to comply with them seasonably, or to pay the balance due, will of course warrant the court in hereafter vacating its order of confirmation, setting aside the sale, and forfeiting the deposit in the trustees' hands.

The order of the referee is approved and affirmed.